UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____
                                              )
UNITED STATES OF AMERICA     )
                                              )    No. 3:19-cr-229-AWT
v.                                           )    No. 3:08-cr-061-SRU
                                              )
SHAUN HAWKINS                   )    March 19, 2020
_____)

## MEMORANDUM IN SUPPORT OF
## EMERGENCY MOTION FOR RELEASE ON BOND

The Defendant, Shaun Hawkins, hereby submits this memo in support of his emergency motion for release on bond. Counsel's understanding is that chambers has received a report from the U.S. Probation Office relaying information from Wyatt Detention Facility that Wyatt is doing all it can and has no positive tests for coronavirus to date.

There was a time not long ago when Connecticut was able to say it had no positive tests. Schools were still open and everyone could go to any restaurant, theater, or sporting events. Lawyers visited clients in prison without concern and scheduling court proceedings were only subject to people's availability.

Now, we face a far different situation. Jails are expected to be one of the hardest hit locations. See Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues*, N.Y. TIMES, Mar. 16, 2020 (copies of all citations are filed with this memo, including the information on sarcoidosis errantly omitted from yesterday's filing); Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. TIMES, Mar. 17, 2020. Never known for publicizing shortcomings, first reports of positive tests in

prison are starting to surface.  Joseph Konig & Ben Feuerherd, *First Rikers Island Inmate tests positive for coronavirus*, N.Y. POST, Mar. 18, 2020.

A magistrate judge in the Northern District of California has issue a standing order to address the change in circumstances and urgency presented.  See CRIMINAL CASE STANDING ORDER RE: PROCEDURE FOR REVIEW OF DETENTION ORDERS IN LIGHT OF CORONAVIRUS PANDEMIC, Mar. 16, 2020, (Cousins, M.J.).  The Court highlights two statutory factors:  "Two of the detention or release factors (among others) to be considered by the judicial officer are (1) the person's "physical and mental condition" (3145(g)(3)(A)) and (2) the nature and seriousness of the danger to any person or the community that would be posed by the person's release (3145(g)(4))."  The Court captures the circumstances the urgency of the circumstances: "This standing order sets forth the procedure for any request to reopen a detention hearing on the basis of the physical and mental condition of the accused. This public health crisis is serious and urgent. Counsel should not delay in evaluating whether any defendant should have his or her detention hearing reopened."

Mr. Hawkins's sarcoidosis puts him in a different risk category, as discussed by the emergency motion.  Wyatt's claim that it is doing everything it can and that it has no positive tests results is heartening but hard to believe on its face because inherent in that statement is the suggestion that people there have been tested for the coronavirus.  The idea that Wyatt is hoarding tests and has tested anyone for the coronavirus – using tests which have routinely been reported to be in short supply – is not credible.

In short, under the circumstances, Mr. Hawkins's "physical . . . condition" calls for his release.  Albeit while on supervised release, he is charged with a handful of low-level

crack sales, with no signs of a weapon or other indicators of violence.  He can be released to a third-party custodian who already is familiar with change in society caused by the coronavirus, as she is required to work from home.  The balance here should tip in favor of his release.

In closing, if the Court is inclined to rely on the reports from Wyatt, Mr. Hawkins would request a hearing with a Wyatt representative present.  Otherwise, the Court should grant his release without a hearing.

Respectfully Submitted,

/s/Charles F. Willson/s/
By Charles F. Willson (# ct24129)
FEDERAL DEFENDER'S OFFICE
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
Tel:    (860) 493-6260
Fax:    (860) 493-6269
email: Charles_Willson@fd.org

## **CERTIFICATION OF SERVICE**

This is to certify that on March 19, 2020, a copy of the foregoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the Government has been provided with a copy of the foregoing.

/s/Charles F. Willson/s/_____

# JOHNS HOPKINS UNIVERSITY ON SARCOIDOSIS

**Coronavirus (COVID-19) Guidelines for All Patients and Visitors**

Please read our COVID-19 guidelines for all patients, appointments, procedures and visitors.

# Health (https://www.hopkinsmedicine.org/health)

## Pulmonary Sarcoidosis

🏷 Lung and Respiratory System (https://www.hopkinsmedicine.org/health/lung-and-respiratory-system)

## What is pulmonary sarcoidosis?

Sarcoidosis is a rare disease caused by inflammation. It usually occurs in the lungs and lymph nodes, but it can occur in almost any organ.

Sarcoidosis in the lungs is called pulmonary sarcoidosis. It causes small lumps of inflammatory cells in the lungs. These lumps are called granulomas and can affect how the lungs work. The granulomas generally heal and disappear on their own. But, if they don't heal, the lung tissue can remain inflamed and become scarred and stiff. This is called pulmonary fibrosis. It changes the structure of the lungs and can affect your breathing. Bronchiectasis can also occur. This is when pockets form in the air tubes of the lung and become infected. But, these problems are not common.

## What causes pulmonary sarcoidosis?

The cause of pulmonary sarcoidosis is unknown. Experts think that bacteria, viruses, or chemicals might trigger the disease. It may also be genetic. This means a person is more likely to develop sarcoidosis if someone his or her close family has it. This is an active area of research.

## What are the symptoms of pulmonary sarcoidosis?

Most people with sarcoidosis do not have symptoms and probably don't know they have the disease. It can affect many organs, causing a variety of symptoms. Pulmonary sarcoidosis can reduce the amount of air the lungs can hold and cause lung stiffness.

The following are the most common symptoms of pulmonary sarcoidosis. However, each person may experience symptoms differently. Symptoms may include:

- Shortness of breath, which often gets worse with activity
- Dry cough that will not go away

- Chest pain
- Wheezing

Sarcoidosis can also cause symptoms not directly related to the lungs, such as:

- Extreme tiredness
- Fever
- Inflammation of the eyes and pain, burning, blurred vision, and light sensitivity
- Night sweats
- Pain in the joints and bones
- Skin rashes, lumps, and color changes on face, arms, or shins
- Swollen lymph nodes
- Weight loss

The symptoms of pulmonary sarcoidosis may look like other conditions or medical problems. Talk with your healthcare provider for a diagnosis.

## How is pulmonary sarcoidosis diagnosed?

In addition to a complete medical history and physical exam, tests used may include:

- **Chest X-ray.** A type of imaging test used to assess the lungs, as well as the heart. Chest X-rays may show important information about the size, shape, and location of the lungs, bronchi (large breathing tubes), and mediastinum (area in the middle of the chest separating the lungs).
- **CT scan.** An imaging test that uses X-rays and computer technology to produce horizontal, or axial, images or slices of the body. A CT scan shows detailed images of any part of the body, including the lungs. CT scans are more detailed than regular X-rays. They can be used to diagnose lung diseases, monitor disease progression, and evaluate response to treatment.
- **Pulmonary function tests.** These are tests that help to measure the lungs' ability to move air in and out of the lungs. The tests are usually done with special machines into which the person must breathe.
- **Blood tests.** These can be used to check the amount of carbon dioxide and oxygen in the blood, evaluate liver and kidney function, and look for infection and other diseases.
- **Bronchoscopy.** A long, thin, flexible tube with a light at the end is put down the throat and into the lungs. This lets the doctor to view the bronchi, the main airways of the lungs. It is done to help evaluate and diagnose lung problems. Lung tissue samples (biopsies) and lung washings (lavage) that remove cells from the lungs can be done through the bronchoscope.
- **Bronchoalveolar lavage.** This is a procedure in which a sterile saline solution is put into the lungs through a bronchoscope and then suctioned out. The saline carries out cells from the lower respiratory tract, which can be checked under a microscope to help identify inflammation and infection. It can help rule out certain causes.
- **Lung biopsy.** A test in which a small piece of tissue, cells, or fluid from the lungs is taken out and checked under a microscope.

## How is pulmonary sarcoidosis treated?

Treatment is generally done to control symptoms and improve the function of organs affected by the disease. Steroid medicine, such as prednisone, may help reduce inflammation. It can be taken by mouth or inhaled. Other medicines, such as methotrexate, may be used in severe cases or if steroids don't work.

In many cases, no treatment is needed for pulmonary sarcoidosis. Different treatments work better for different people. Sometimes more than one treatment is used. Most medicines used to treat sarcoidosis suppress the immune system.

You may also join a rehab program that includes education, exercise, and support. In severe cases, which are not common, oxygen therapy and even lung transplant may be needed.

## Key points about pulmonary sarcoidosis

- Sarcoidosis is caused by inflammation. Most cases of sarcoidosis are found in the lungs and lymph nodes, but it can occur in almost any organ.
- Sarcoidosis in the lungs is called pulmonary sarcoidosis. It causes small lumps of inflammatory cells, called granulomas, in the lungs. They can affect how the lungs work.
- The cause of pulmonary sarcoidosis is unknown.
- The most common symptoms of pulmonary sarcoidosis are shortness of breath, which often gets worse with activity; dry cough that will not go away; chest pain; and wheezing.
- Treatment is generally done to control symptoms or to improve the function of organs affected by the disease. Steroids are often used.

## Next steps

Tips to help you get the most from a visit to your healthcare provider:

- Know the reason for your visit and what you want to happen.
- Before your visit, write down questions you want answered.
- Bring someone with you to help you ask questions and remember what your healthcare provider tells you.
- At the visit, write down the name of a new diagnosis, and any new medicines, treatments, or tests. Also write down any new instructions your healthcare provider gives you.
- Know why a new medicine or treatment is prescribed, and how it will help you. Also know what the side effects are.
- Ask if your condition can be treated in other ways.
- Know why a test or procedure is recommended and what the results could mean.
- Know what to expect if you do not take the medicine or have the test or procedure.

- If you have a follow-up appointment, write down the date, time, and purpose for that visit.
- Know how you can contact your healthcare provider if you have questions.

## Request an Appointment

Maryland 410-955-5000

Outside of Maryland 855-695-4872

International +1-410-502-7683

## Related

Occupational Lung Diseases (https://www.hopkinsmedicine.org/health/conditions-and-diseases/occupational-lung-diseases)

Interstitial Lung Disease (https://www.hopkinsmedicine.org/health/conditions-and-diseases/interstitial-lung-disease-pulmonary-fibrosis)

Goodpasture Syndrome (https://www.hopkinsmedicine.org/health/conditions-and-diseases/goodpasture-syndrome)

## Related Topics

Lung and Respiratory System (https://www.hopkinsmedicine.org/health/lung-and-respiratory-system)

Copyright © 2020 The Johns Hopkins University, The Johns Hopkins Hospital, and Johns Hopkins Health System. All rights reserved.

/

# NEWSPAPER ARTICLES

**The New York Times**  https://nyti.ms/3d4c4uY

# An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues

The conditions inside, which are inhumane, are now a threat to any American with a jail in their county — that's everyone.

**By Amanda Klonsky**
Dr. Klonsky leads a prison education organization.

March 16, 2020, 5:00 a.m. ET

If you think a cruise ship is a dangerous place to be during a pandemic, consider America's jails and prisons. The new coronavirus spreads at its quickest in closed environments. And places like nursing homes in affected areas have begun to take precautions at the behest of families and experts. As this new disease spreads, it has become equally important for all of us to ask what steps are being taken to protect the health of people in jails and prisons, and the staff who work in them.

The American criminal legal system holds almost 2.3 million people in prisons, jails, detention centers and psychiatric hospitals. And they do not live under quarantine: jails experience a daily influx of correctional staff, vendors, health care workers, educators and visitors — all of whom carry viral conditions at the prison back to their homes and communities and return the next day packing the germs from back home. How will we prevent incarcerated people and those who work in these institutions from becoming ill and spreading the virus?

This week, the Harris County Juvenile Court in Houston announced that the court wing will be fully closed to all until further notice, after officials reported that a person who had been in the court may test positive for coronavirus. And an employee at a correctional facility in Pennsylvania also tested positive for Covid-19. Thirty-four inmates and staffers there are now in quarantine. On Friday, the Federal Department of Correction announced that incarcerated people at all 122 federal correctional facilities across the country will not be allowed visits from family, friends or attorneys for 30 days, in response to the threat of the coronavirus. But this ethical sacrifice raises more questions than it answers about the broader set of changes that will be required to limit this contagion while protecting the rights of incarcerated people.

In America's jails and prisons, people share bathrooms, laundry and eating areas. The toilets in their cells rarely have lids. The toilet tank doubles as the sink for hand washing, tooth brushing and other hygiene. People bunked in the same cell — often as many as four — share these toilets and sinks. Meanwhile, hand sanitizer is not allowed in most prisons because of its alcohol content. Air circulation is nearly always poor. Windows rarely open; soap may only be available if you can pay for it from the commissary.

These deficiencies, inhumane in and of themselves, now represent a threat to anyone with a jail in their community — and there is a jail in every county in the United States. According to health experts, it is not a matter of if, but when, this virus breaks out in jails and prisons. People are constantly churning through jail and prison facilities, being ushered to court hearings, and then being released to their communities — nearly 11 million every year.

"We should recall that we have 5,000 jails and prisons full of people with high rates of health problems, and where health services are often inadequate and disconnected from the community systems directing the coronavirus response," said Dr. Homer Venters, former chief medical officer of the New York City jail system. "Coronavirus in these settings will dramatically increase the epidemic curve, not flatten it, and disproportionately for people of color."

Jails are particularly frightening in this pandemic because of their massive turnover. While over 600,000 people enter prison gates annually, there are about 612,000 people in jail on any given day. More than half of the people in jail are only in there for two to three days. In some communities, the county jail or prison is a major employer. Jail staff members are also notoriously underpaid, may not have paid sick leave and are more likely to live in apartments, in close and frequent contact with neighbors. They return home daily to aging parents, pregnant partners or family members with chronic conditions.

Our penal system should have received more comprehensive guidance and material support from the Department of Justice, far earlier in this crisis. Like much of the federal level response, it is falling short.

Encouragingly, others have taken the lead. The San Francisco district attorney, Chesa Boudin, together with the public defender, Manohar Raju, were the first to take proactive steps to release as many people as safely possible who are at heightened risk from coronavirus. Mr. Boudin directed his prosecutors not to oppose release motions for misdemeanor or nonviolent felony pretrial detainees where the person poses no threat to public safety.

"We are trying to absorb information from countries who have experienced the Covid-19 pandemic before us," said Dr. Alysse Wurcel, an infectious diseases physician at Tufts Medical Center and at six county jails in eastern Massachusetts. "But since the United States has the highest incarceration rate in the world, it is difficult to extrapolate the potential impact."

American officials can learn from the harrowing story of South Korea's Daenam Hospital. In late February, South Korea had already reported more than 3,150 confirmed cases, and of these, 101 were from patients in the Daenam psychiatric ward. Seven of these patients have now died. All but two patients in the ward contracted Covid-19. The ward was put on lockdown, in an attempt to confine the spread of the virus. Instead, the lockdown issued was a death sentence to many inside.

Across the United States, activists for prisoners' rights have repeatedly requested plans to protect against an outbreak in prisons. Still, only a few jurisdictions have released plans. Some make good sense — one from the New York City Department of Correction includes screening people for flulike symptoms before placing them in group holding cells, and sending people who have flulike symptoms to a communicable diseases unit for treatment.

But those steps do not go far enough, nor do they affirmatively indicate an understanding of the ways this virus spreads: Will the incarcerated laborers now creating "NYS Clean," the New York State government-manufactured hand sanitizer, be wearing N95 masks and gloves? The plan indicates that people incarcerated in dormitories on Rikers Island are being asked to sleep head to toe and three feet apart in the bunks, as if this short distance could prevent the spread of the virus if it's present. It won't.

There are yet more reasons to be concerned. With about 40 percent of incarcerated people suffering from a chronic health condition, the overall health profile of people in jails and prisons is abysmal. And the older prison population is among the most vulnerable to severe complications from Covid-19. There are 274,000 people aged 50 or older in state and federal prisons in the United States. If this group were separated from the rest of the U.S. prison population, they would be the seventh-largest prison system in the world.

Aging people who are released after serving long sentences have a recidivism rate close to zero. Governors and other public officials should consider a one-time review of all elderly or infirm people in prisons, providing immediate medical furloughs or compassionate release to as many of them as possible.

It is also critical that jails take swift action to reduce the number of people in confinement. Local law enforcement can safely reduce these numbers in several ways: These include reclassifying misdemeanor and lower-level felony offenses that do not threaten public safety into non-jailable offenses, using citations instead of arrests for all low-level crime and indefinitely postponing all parole and probation office visits.

This crisis demands that prison and jail staff members be trained in methods to prevent transmission. And the diagnostic tests for the virus, which have been extremely slow to roll out, should make their way to jails and prisons too. Incarcerated people who test positive for the coronavirus should be offered immediate access to free, high-quality health care. And anyone in jail in pretrial detention (which means they haven't been convicted of anything and most likely just cannot afford bail), who can be safely released, should be released. To do anything less than all of this — out of hate, apathy or spite — will endanger us all.

Dr. Amanda Klonsky (@amandaklonsky1), a scholar of education and mass incarceration, is the chief program officer for a prison education organization.

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow The New York Times Opinion section on Facebook, Twitter (@NYTopinion) and Instagram.*

# 'We Are Not a Hospital': A Prison Braces for the Coronavirus

In places where social distancing is impossible and medical care strained, bars won't stop the infection's spread.

 By Danielle Ivory

Published March 17, 2020   Updated March 18, 2020, 1:29 p.m. ET

Packed into a crowded federal prison complex with not enough masks, soap or hand sanitizer, and the sole doctor out sick, corrections workers in Tallahassee, Fla., were worried.

Then on Monday, a new inmate arrived and was immediately put into quarantine. And on Tuesday, a bus with almost a dozen inmates from a U.S. Immigration and Customs Enforcement detention center showed up.

They were scheduled for quarantine, too. And all had elevated temperatures.

"I just delivered hand sanitizer to the unit that the inmates will be housed in," said Kristan Morgan, a nurse practitioner at the prison who checked the new arrivals' temperatures. "Staff are starting to get fearful."

In jails and prisons across the country, concerns are rising of a coronavirus outbreak behind bars. Already, cases have been reported. On Friday, someone who works in a Washington State prison tested positive for the virus, and the day before, the sheriff in Hancock County, Ind., said a staff member at the local jail was being isolated at home after a positive test. On Tuesday night, New York State confirmed that an employee at the Sing Sing Correctional Facility had tested positive.

In New York City, the Department of Correction over the weekend announced its first death from the virus: David Perez, 56, an investigator who was based in the department's headquarters in Queens. Mr. Perez had not had contact with inmates for weeks, according to a person familiar with the matter.

To try to prevent an outbreak in the federal prison system that holds more than 175,000 people, the Bureau of Prisons has suspended all visits for 30 days, including most by lawyers. It has also barred transfers of inmates between facilities, with few exceptions. The bureau said the densely packed nature of prisons "creates a risk of infection and transmission for inmates and staff."

Many state prison systems and local jails, where a vast majority of imprisoned people are held, also suspended visits last week. A jail in Santa Clara County, Calif., placed inmates in quarantine after a visitor tested positive for the virus.

In other countries where the pandemic is more widespread, both prisoners and guards have fallen sick. The coronavirus swept through Chinese prisons in late February, with reports of more than 500 cases spreading across at least four facilities in three provinces. And Iran temporarily freed about 70,000 prisoners earlier this month to help curb the epidemic there.

Advocates in the United States have sounded alarms over whether correctional facilities here are adequately prepared to stop an outbreak within their walls. Much of the advice given by the federal Centers for Disease Control and Prevention — such as staying six feet away from others and routinely disinfecting surfaces — can be nearly impossible to follow behind bars.

As the outbreak continued to spread on Tuesday, public defender groups in New York City called for the release of detainees in the city jails, including on Rikers Island, who are being held on parole violations, are over 50 or have pre-existing health conditions. "The city must take basic and humane steps to prevent suffering and loss of life," said Tina Luongo, the chief criminal defender of the Legal Aid Society.

The union for the city's corrections officers countered that "instead of recklessly letting inmates out," the city should "bring in more masks, gloves, hand sanitizers and other vital supplies" for jail employees. A spokesman for the union said that corrections officers were given 3,000 masks, but they need 10,000.

More than a dozen employees of the federal prison system, including staff in New York and Texas, told The New York Times that their facilities were also ill-prepared for a coronavirus outbreak, or even a quarantine. One prison worker at a facility in Texas said that medical supplies and staff were short, even without an outbreak, and that if the prison had multiple cases, some would need to be sent to a nearby hospital for treatment.

"I can't imagine a local hospital giving inmates preference if they get to the point they have to make hard decisions on saving lives," the worker said, but added that the prison simply would not be able to handle a surge. "We don't have ventilators on hand at all. We are not a hospital. We don't have the medical staff."

In late February, Jeffrey Allen, the Bureau of Prisons' medical director, sent a memo to all clinical directors at federal prisons across the country, urging them to screen incoming inmates for the virus and to establish "baseline" supplies like gloves, surgical and N95 masks, and gowns.

In Tallahassee, the placement of new inmates directly into quarantine ramped up the concerns of staff members who were already nervous about their ability to contain an outbreak. Seven employees described the situation to The Times. Some spoke on the condition of anonymity because they feared retaliation from the Bureau of Prisons, while others are protected by their status in the prison employees' union. The bureau did not authorize them to speak.

Ray Coleman, a teacher at the prison complex, and other employees said the agency quarantined the new inmates in a unit away from the general population, but where they would still have close contact with prison employees.

Mr. Coleman said that prison officials told him on Tuesday that the bureau was planning to send more new inmates this week; they would also be placed in quarantine, he was told, likely in a special housing unit nicknamed "the SHU" that is generally reserved for inmates who get into trouble or need protection. Inmates in the unit are not usually allowed to roam freely outside of their cells, and may bathe and exercise on a limited basis.

When they do leave their cells — to shower, for example, on Mondays, Wednesdays and Fridays — they must be closely accompanied by prison staff.

"We can't escort an inmate with a six-foot rule," said Yamira Richardson, a correctional officer who is currently working in the SHU. She worries about being exposed and then transmitting the virus to co-workers, inmates or family members.

"A lot of us are parents," said Ms. Richardson, who is also a steward in the local union. "A lot of us are caregivers to parents and elderly relatives."

Ms. Richardson and other employees said they were also concerned about staffing. If employees must stay home because they are sick, the already understaffed prison will suffer, they said.

The Bureau of Prisons declined to make Erica Strong, the prison complex's warden, available for an interview. A bureau spokesperson said there were no known cases of the coronavirus in the federal prison system but did not respond to specific questions, instead providing a statement that the suspension of inmate transfers announced last week had exceptions.

"Admission of new inmates will continue," the statement said, adding that the inmates received by the Tallahassee prison complex had been approved. "Out of an abundance of caution, these inmates were screened and placed on observation."

The statement said that an ample amount of cleaning, sanitation and medical supplies was on hand and ready to be distributed or moved to any facility as deemed necessary.

On March 13, Ms. Strong sent a memorandum to all staff members at the prison complex, assuring them that surgical and N95 masks, gloves and medical gowns would be "available at all departments."

Mr. Coleman, who is president of the prison's local union, replied in a series of memos that the gear was not widely available, and that N95 masks on back order had a projected shipping date of March 20 or later. He laid out a list of units with little or no protective gear — including the education department, the psychology department and the SHU. He noted that some areas did not have hand soap.

He said that because of a lack of supplies, the medical unit was reusing masks that are supposed to be used only once.

Ms. Morgan, the nurse practitioner who is also the vice president of the local prison union, said the complex had struggled to get basic supplies like hand sanitizer and was expecting to have to ration masks. Most of the ones on hand are either too small or too large for most prison workers, she added. "We don't know if or when we are going to get more."

No inmates at the complex have been tested for the coronavirus, Ms. Morgan said — largely because there are no tests available at the prison, and it is unclear how oral and nasal swabs would be transferred off-site for testing. Medical staff have been told that they may need to report to work after hours to screen incoming inmates in the future.

The Bureau of Prisons considers a temperature of 100.4 to be the threshold for a fever, according to its visitor screening documents. Ms. Morgan was working when the bus of ICE inmates arrived on Tuesday. She said the inmates' temperatures were in the 99.3 to 101.2 range, all of which she considered to be high.

Jan Ransom and Nicholas Bogel-Burroughs contributed reporting.

**The Coronavirus Outbreak**

How Is the U.S. Being Affected?

Updated March 17, 2020

- The coronavirus has now been identified in all 50 U.S. states, and more than 100 deaths in the country have been linked to the illness. We are tracking every case.

- On day one of the shelter-in-place order in the Bay Area, the distinction between essential and nonessential was blurred.

- College students are being sent home. Graduation is cancelled. Some students are taking it into their own hands.

- The coronavirus has descended on a rural town in Kentucky. 6 residents are sick. bullet: In jails and prisons across the country, concerns are rising of a

READ MORE

METRO

# First Rikers Island inmate tests positive for coronavirus

By Joseph Konig and Ben Feuerherd                                      March 18, 2020 | 4:45pm | Updated



Rikers Island
Reuters

The first Rikers Island inmate tested positive for coronavirus on Wednesday — hours after a correction officer at the city jail also confirmed they had the deadly illness.

The second case on the island in 24 hours signaled the possibility of an outbreak at the jail, the head of the corrections officers' union said.

Elias Husamudeen, the president of the Correction Officers Benevolent Association, urged the board of corrections to "implement their contingency plans" after the inmate tested positive.

"This crisis will grow worse with each passing day. Give us the help we need now!" he said in a statement.

Husamudeen called for the city to provide N95 masks to Correction officers that better protected against the virus than the paper N95 masks.

The union is also calling for new inmates to not be housed on the island because they could introduce the virus into the population.

Earlier Wednesday, the first city Department of Correction officer tested positive for coronavirus.

The officer works security for the front gate at a jail facility on Rikers Island, said Michael Skelly, a spokesman for the Correction Officers Benevolent Association.

A civilian investigator with the city's DOC died late Sunday from the coronavirus, marking the city's first municipal-worker fatality from the illness.

FILED UNDER   **CORONAVIRUS**, **CORONAVIRUS IN NY**, **INMATES**, **RIKERS ISLAND**

/

# ORDER FROM
# NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRIMINAL CASE STANDING ORDER RE: PROCEDURE FOR REVIEW OF DETENTION ORDERS IN LIGHT OF CORONAVIRUS PANDEMIC | Magistrate Judge Nat Cousins Effective March 16, 2020 |

I am issuing this criminal standing order on March 16, 2020, in response to the coronavirus pandemic. It applies to every open criminal case in which I have ordered a criminal defendant to be detained and that defendant is presently held in custody awaiting trial. Most detainees in this District are presently housed at Santa Rita Jail in Alameda County, California. Defendants detained by other judges are not covered by this standing order. A copy of this order will also be provided to the offices of the Federal Public Defender, the United States Attorney, the CJA attorney coordinator, U.S. Pretrial Services, and posted publicly on the Court's web page.

Under the Bail Reform Act, 18 U.S.C. § 3145(f)(2), a detention hearing may be reopened at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the detention hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community. Two of the detention or release factors (among others) to be considered by the judicial officer are (1) the person's "physical and mental condition" (3145(g)(3)(A)) and (2) the nature and seriousness of the danger to any person or the community that would be posed by the person's release (3145(g)(4)).

The Crime Victims' Rights Act, 18 U.S.C. § 3771, also provides crime victims the

statutory right to be reasonably protected from the accused, to reasonable notice of any public court proceeding involving the crime or release of the accused, the right to be reasonably heard and not excluded from public court proceedings, the right to be treated with fairness and respect, the right to confer with the attorney for the Government in the case, the right to proceedings free from unreasonable delay, and the right to be informed of the rights under the Act. The Court shall ensure the crime victim is afforded the rights described in the Act. 18 U.S.C. § 3771(b)(1).

This standing order sets forth the procedure for any request to reopen a detention hearing on the basis of the physical and mental condition of the accused. This public health crisis is serious and urgent. Counsel should not delay in evaluating whether any defendant should have his or her detention hearing reopened.

1. Counsel for the Government and accused must confer first in an effort to determine if they agree.

2. The Government must provide notice and an opportunity to confer and be reasonably heard to any crime victim.

3. Any stipulation or motion to reopen must be filed in the ECF system.

4. The motion should state whether the defendant waives personal presence at the hearing.

5. Copies of the motion to reopen must be provided to Pretrial Services and to Clerk's Office Manager Snooki Puli at Snooki_Puli@cand.uscourts.gov. This may be by email.

6. Unless otherwise ordered, no hearing will be held in person. Counsel, clients, and crime victims will be allowed to participate by telephone or video to the extent practicable.

IT IS SO ORDERED.

Date: March 16, 2020

_____
Nathanael M. Cousins
United States Magistrate Judge